UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 2:08-CR-102 |
| | ) | |
| JESUS HUERTA, *ET AL.* | ) | |

**MEMORANDUM OPINION AND ORDER**

The defendant, Gustavo Gamino-Villa, filed a motion to suppress, [Doc.849], and an evidentiary hearing was held on the motion on January 5, 2010. For the reasons announced orally from the bench and for the reasons which follow, the motion to suppress is DENIED.

**Findings of Fact**

The motion of the defendant seeks suppression of items seized during a search of 750 Georgia Street, Johnson City, Tennessee on May 27, 2008. Three Washington County Sheriff's Department officers testified at the evidentiary hearing, as did the defendant. The testimony of the defendant concerning the events of May 27 differed from that of these officers in several significant respects. This Court found the testimony of the officers, Patrolman William Rhodes, Lieutenant Edwin Graybeal and Lieutenant William Gregg to be completely credible, although their testimonies differed in some insignificant respects, and found the defendant's testimony to be less than credible. All matters of credibility have, therefore, been resolved in favor of these officers and against the defendant.

On May 27, 2008, Tiffany Arana contacted Washington County 911 with a report that her vehicle had been taken by her ex-boyfriend, Victor Lopez, who refused to return it. She further reported to the 911 dispatcher that she had encountered an Hispanic male driving the vehicle on the

prior Saturday but, when she approached him about the return of the vehicle, he drove away. She also told the dispatcher that Lopez was in jail and was about to be released.

As a result of Arana's call to 911, Washington County Sheriff's Deputy William Rhodes was dispatched. Rhodes went to Arana's residence where he talked to her and confirmed the details of her 911 call. Rhodes concluded that the matter was a civil matter. After he left Arana's residence enroute to another call, he telephoned his supervisor, Lieutenant Graybeal. After the conference with Graybeal, Rhodes was instructed by Graybeal to file a stolen vehicle report, since the vehicle was registered to Arana and Lopez was keeping it from her. Rhodes contacted 911 to obtain a telephone number for Arana and instructed her to meet him. When Rhodes met Arana, she informed him that the Hispanic male she had seen driving her vehicle, a green Tahoe, on the prior Saturday "was up the road at a laundromat" in a different vehicle, a gold Crown Victoria.

Rhodes proceeded to the laundromat and Arana arrived there almost immediately in her separate vehicle. Upon his arrival, Rhodes observed a gold or brown Crown Victoria leaving the laundromat. Arana identified the driver, who was later identified as the defendant, Gusatvo Gamino-Villa, as the Hispanic male she had seen driving her vehicle on the prior Saturday. Rhodes pulled out behind the car, which was separated from his cruiser by a couple of other vehicles. Rhodes followed the defendant for approximately two miles before catching up to the Crown Victoria, which had parked in front of a residence at 750 Georgia Street. Except for a brief time when passing the two vehicles which separated his cruiser from the Crown Victoria, Rhodes never activated his blue lights.[1]

---

[1] Gamino-Villa had driven out of the officer's sight when the emergency blue lights were turned on. The lights were turned off after Officer Rhodes passed the two cars.

2

After defendant parked the Crown Victoria in front of 750 Georgia Street, he exited the vehicle and headed for the steps of the house. Rhodes, who had parked his cruiser behind the Crown Victoria, approached Gamino-Villa and asked if they could talk. Rhodes asked Gamino-Villa if he could speak English and Gamino-Villa responded by making a gesture by holding up his hand with his index finger just above his thumb[2] and said "just a little." Rhodes asked for identification and the defendant shook his head "no." By this time Arana had arrived at 750 Georgia Street and she and the defendant engaged in a conversation in Spanish. While Arana and the defendant were talking, Arana said "there's my vehicle" and indicated a green Tahoe in the driveway of 750 Georgia Street. Rhodes went to the Tahoe, which was locked. Arana, along with Gamino-Villa, had followed Rhodes to the driveway where the Tahoe was parked.[3] Arana told Rhodes the defendant had the keys to the Tahoe in the house and would get them. Gamino-Villa entered the house by the back door and went out of sight, but did not have the key when he returned.[4]

Rhodes then knocked on the back door and no one answered. Meanwhile, Arana and the defendant had continued to talk in Spanish. While at the backdoor, Rhodes noticed a plastic grocery bag near the door which contained currency wrappers for $20.00 bills, but no currency. Thinking the money wrappers "odd" and thinking they might be connected to some recent robberies in Johnson City, Rhodes called Lieutenant Graybeal to tell him he had found the vehicle and seen the

---

[2] Rhodes described a gesture which is commonly understood to mean "just a little."

[3] A Johnson City Police Department officer had also arrived at 750 Georgia Street in response to a request by Rhodes for back up out of concern for his safety. The Johnson City officer accompanied Rhodes through a gate across the driveway to the place where the Tahoe was parked.

[4] Although it makes no difference to the Court's analysis, the locked Tahoe was later opened by the officers, apparently with a key. There was no testimony which established how the officers entered the Tahoe, although Graybeal testified that Rhodes told him that Gamino-Villa had produced a key while Gamino-Villa testified that the key was provided by Arana.

3

money wrappers. Graybeal told Rhodes he would come to the scene and he arrived within 15 to 20 minutes. Arana and Gamino-Villa continued to talk to each other the entire time. When Graybeal arrived, he briefly conversed with the defendant in Spanish and then said defendant had consented to a search of the house. Graybeal, who does not speak Spanish but has received training in several key Spanish phrases, first asked the defendant if he spoke English, to which Gamino-Villa responded "no". He then asked, in Spanish, for permission to search the house, using a common form and a more proper form of Spanish. The defendant responded "Si" to both requests.

Gamino-Villa, after giving consent to a search of the house, gestured toward the area of the back door, as if to indicate that the officers should follow him into the house.[5] Gamino-Villa then led the officers through the back door of the house and walked in front of the officers to each room as if giving the officers a "tour". As the officers walked through the house, they noticed an empty holster, various items of drug paraphernalia, marijuana residue and a cooler. A search of the house produced $80,010 in cash hidden in the bottom liner of the cooler and $2,490 underneath a bathroom counter. In a bedroom, the officers found various documents identified with defendant, including a Mexican photo identification card, a social security card, his photograph, a Federal Express shipping label addressed to the defendant[6] and a receipt from the Washington County Sheriff's Department for a $500.00 payment made on Gamino-Villa's behalf by Cynthia Hamm, who is the sister-in-law of Jesus Huerta.

At some point, a Johnson City Police Department K-9 had alerted on or near one of the out buildings on the property. Since Gamino-Villa, who had been arrested after the discovery of the

---

[5] By this time, other officers had arrived on the scene, including Lieutenant Gregg.

[6] This shipping label had an address of 1200 Taylor Bridge Road, an address Jesus Huerta had used. Gamino-Villa testified he had rented 1200 Taylor Bridge Road from Huerta.

items in the residence, had originally given consent only for the search of the house, a Spanish speaking deputy was used to seek consent from the defendant to search the yard and outbuildings. Defendant refused and the officers then obtained a search warrant from a state court judge. During the subsequent search of the remainder of the property, the officers discovered materials which appeared to have been used to package marijuana and several firearms buried near one of the out buildings.

After the officers opened the green Tahoe a document was located which indicated that Arana had transferred title of the Tahoe to Lopez. As a result of the discovery of this document, Arana was arrested for filing a false police report. She was subsequently convicted of the offense.

**II.     Analysis**

The defendant argues in his motion that he was seized as a result of his "stop and detention" on May 27, 2008, and that the "stop, detention, and searches violated his rights under U.S.CONST.,Amends. IV and V." He alleges that his "stop and detention" were not only unjustified but pretextual . . . pursuant to a plan to obtain his consent to a search of these premises."[7] Gamino-Villa disclaims any legal, possessory or other interest in the premises at 750 Georgia Street but also, interestingly, argues that his consent to the search was "obviously coerced" because he did not understand the request made by the officer.

There are two threshold issues which the Court must address in analyzing the defendant's motion. As a general matter, those who are found to have denied ownership of property have no

---

[7] Gamino-Villa asserts that Lt. Graybeal, recognizing that Victor Lopez was a subject of interest in an on-going drug trafficking investigation, instructed Deputy Rhodes to file a stolen vehicle report as a pretext to obtain consent to search 750 Georgia Street. Graybeal testified, however, that he did not recall Rhodes informing him who the suspect was and that he had no prior information about 750 Georgia Street. Nothing in the record even remotely suggests that the events of May 27 were the result of a pretext to obtain consent to search.

5

Case 2:08-cr-00102-JRG-MCLC   Document 879   Filed 01/12/10   Page 5 of 10   PageID #: 3641

standing to challenge its seizure. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). *See also United States v. Abdullah*, 162 F.3d 897, 902 (6th Cir. 1998) (defendant had no standing to contest the search of a storage locker which he "firmly and unequivocally" denied renting at the time of the search). A defendant who denies ownership of property loses all standing he may otherwise have had to contest its search or seizure. *Rawlings*, 448 U.S. at 104. To the extent, then, that the defendant seeks to challenge the search of the premises at 750 Georgia Street, he lacks any standing to do so, having disclaimed all legal, ownership or possessory interest in the property, and his motion is due to be denied on that ground.

Apparently understanding the incriminatory nature of the items found during the search of the house at 750 Georgia Street, and realizing that he cannot, as a result, acknowledge ownership or possessory interest in the premises, Gamino-Villa makes the somewhat unusual argument that his initial encounter with Officer Rhodes constitutes a seizure under the Constitution which is unconstitutional under the standard enunciated in *Terry v. Ohio*, 392 U.S. 1 (1968), and that the subsequent search of 750 Georgia Street was illegal as "fruits of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471 (1968). The second important question which the Court must answer and analyze in relation to the defendant's motion is, therefore, whether the encounter between Officer Rhodes and Gamino-Villa constituted a seizure within the meaning of the Fourth Amendment. Only if the defendant was seized is he vested with any right to constitutional safeguards. *United States v. Mendenhal*, 466 U.S. 544, 553 (1980). This Court concludes, however, that there was no seizure of the defendant by Officer Rhodes and that the encounter between Rhodes and Gamino-Villa was a consensual encounter rather than a *Terry* stop.

"Under the Fourth Amendment, there are three types of permissible encounters between the

police and citizens: consensual encounters in which contact is initiated by a police officer without any articulable suspicion whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or *Terry* stop which must be predicated upon 'reasonable suspicion;' and arrest which must be based on probable cause." *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994) (citing *United States v. Ushery*, 968 F.2d 575, 579 (6th Cir. 1992); *United States v. Flowers*, 909 F.2d 145, 147 (6th Cir. 1990)).

A "seizure" has been defined by the Supreme Court as occurring at that point in time when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhal*, 466 U.S. at 554. Although the defendant argues that the encounter with Officer Rhodes was an investigatory detention rising to the level of a seizure under the Constitution, the encounter, when viewed in light of all the circumstances, would not lead a reasonable person to believe that Gamino-Villa was not free to leave and that this was simply a consensual encounter between Officer Rhodes and Gamino-Villa.

Rhodes did not effect a traffic stop; rather, he simply parked his police cruiser behind the vehicle driven by Gamino-Villa. He did not engage his blue lights. Rhodes did not command Gamino-Villa to exit the vehicle; on the contrary, Gamino-Villa voluntarily exited his vehicle and began to approach the house at 750 Georgia Street. Rhodes then simply approached Gamino-Villa and asked if he could speak English and asked for identification. Although Gamino-Villa argues that he produced a Mexican driver's license which Officer Rhodes retained, the Court credits Officer Rhodes' testimony that Gamino-Villa was unable to produce any identification.[8] Almost

---

[8] In fact, Gamino-Villa's Mexican driver's license was later located inside the bedroom of the house.

7

immediately after this brief encounter, Ms. Arana arrived at 750 Georgia Street, began a conversation with the defendant in Spanish and then pointed out her vehicle which she had reported stolen to the officer. Nothing in the record suggests that Gamino-Villa was instructed to remain where he was or that his ability to leave the scene was impeded by the officer in any fashion.

Gamino-Villa was not placed under arrest, nor was he handcuffed.[9] Likewise, the fact that Officer Rhodes did not engage his emergency lights when he pulled in behind Gamino-Villa's vehicle and that he did not block the defendant's car from leaving with his police cruiser are also important factors which suggest that this was a consensual encounter rather than a *Terry* stop. See *United States v. See*, 574 F.3d 309 (6th Cir. 2009). The evidence in the case establishes that Officer Rhodes walked away from where Gamino-Villa and Arana were talking to check the Tahoe automobile parked in the driveway of the residence. Gamino-Villa continued his voluntary conversation with Arana, approached the officer in the driveway on his own, and based upon Arana's representations that he could produce the key for the Tahoe, he voluntarily entered the house alone to retrieve the key.[10] All of this leads the Court to the clear conclusion that the encounter between Rhodes and Gamino-Villa at 750 Georgia Street on May 27 was a consensual encounter and that no seizure implicating the Fourth Amendment ever occurred.

Even if the encounter between Rhodes and Gamino-Villa were analyzed as a *Terry* stop, the record in the case establishes that, at the time of the encounter, based on the totality of the circumstances, Rhodes had a reasonable suspicion that criminal activity was occurring which

---

[9] Officer Rhodes testified that he did not handcuff the defendant and Lieutenant Graybeal testified that the defendant was not handcuffed when he arrived at 750 Georgia Street. The defendant's testimony that he was handcuffed almost immediately by Officer Rhodes is not believed.

[10] Gamino-Villa does not dispute that he went into the house. According to the defendant, he went into the house to see if he could find someone who could tell him what was going on.

justified the brief investigatory stop. It had been reported to Officer Rhodes that an Hispanic male had been seen by Arana on the prior Saturday driving her vehicle which was, as far as the officer knew at the time, being unlawfully kept from her.[11] Just a few minutes prior to the encounter, Arana had personally identified the defendant, driving a gold colored Crown Victoria, as the person who was driving her stolen vehicle on the prior Saturday and whom she had approached, but who had driven away without returning the automobile to her. These circumstances alone raise sufficient reasonable suspicion for Officer Rhodes to conduct a *Terry* stop. Therefore, even if there were a *Terry* stop here, the stop was supported by reasonable suspicion and was not unlawful.

One last issue needs to be addressed. Gamino-Villa's assertions that he did not consent to a search of the house at 750 Georgia Street or, alternatively, that his consent was coerced, even if somehow relevant to the Court's analysis, are contradicted by the record. Lt. Graybeal asked for consent to search the house in Spanish and the defendant responded affirmatively. His verbal consent was confirmed by the gesture he made after his affirmative response. Gamino-Villa extended his arm toward the back door as if to say to the officers: "follow me." [12] He then entered the house in front of the officers and led them throughout the house. Both his words and actions contradict Gamino-Villa's assertions that he did not give consent or that his consent was coerced.

**III. Conclusions.**

For the reasons set forth above, in supplement to those announced earlier from the bench

---

[11] The fact that Arana's report was later determined to be false is irrelevant to the Court's analysis. The officer clearly had no reason to believe it was false at the time.

[12] Lt. Gregg illustrated the gesture for the Court during his testimony.

9

on January 5, 2010, the defendant's motion to suppress, [Doc. 849, is **DENIED.**

So ordered.

ENTER:

                                                                s/J. RONNIE GREER
                                           UNITED STATES DISTRICT JUDGE